In our second case we have United States v. Mhana, if I'm not mispronouncing it, and Mr. Jones, you're representing the appellate. Yes, Your Honor. Good to have you with us, sir. Thank you, Your Honor. Your Honor, may it please the Court, Mark Jones for Rami Mhana. Through multiple exhibits, the government sought to have its investigative work product and its advocacy admitted as substantive evidence of Mhana's guilt. Over Mhana's objections, dozens of intertwined and overlapping exhibits were admitted in this case in violation of the federal rules of evidence. This appeal has selected and presented three of what we see as the most prejudicial abuses of the district's court's discretion during the trial. The harmless error review is not a sufficiency of the evidence review, and so the question is not whether the remaining untainted evidence would have been enough, but the question is whether the prejudicial nature of the admitted exhibits could have or may have swayed the jury. It is the government's burden to demonstrate that none of the admitted evidence that was improperly admitted could have impacted a single juror. We do not believe that they can or have met that high burden. We believe that this court— Has the government admitted there was error in admission of any of those exhibits? No, Your Honor. No, so you have to prove that they were erroneously admitted. You have to convince us that, that Judge Cogburn abused his discretion. Yes. In the admission rulings. That's correct, and through our opening— Every one of the rulings challenged is reviewed for abuse of discretion, if I'm correct. You are, Your Honor. I think I am, yes. That's right, and we believe through both our opening brief and our reply brief and a thorough reading of this transcript, there's not much doubt that there were evidentiary errors and abuses of discretion, and what's important to note is that on a number of these evidentiary issues, the district court, mid-trial, reversed itself, recognizing that what it had already admitted, what had already been published— Well, that's commendable. It is, but what it does, Your Honor, is it recognizes that even midstream, the judge recognized errors in some of his rulings, and what we don't have, as things are changing midstream, are limiting instructions and corrections to what's going on. So, the first of the issues that we saw— Did you ask for limiting instructions that were denied? In some instances, the court gave limiting instructions. In other instances, it was left unstated so as not to highlight the prejudice that was occurring from— That's an appropriate way to deal with it in the context of what's going on at the trial. That's what judges do. That's correct, but it doesn't— And Judge Cogburn has tried a lot of these criminal cases and other kinds of cases, both sitting on the bench and sitting in your capacity. He has, Your Honor, and the court, having read the transcript, will pick up that every participant in that courtroom was very familiar with the case, the evidence, the rules of evidence, and all of us have tried many cases, both with, against, and in front of Judge Cogburn in the Western District of North Carolina. If you look at the summary exhibits, these were particularly problematic because they essentially were the government's closing argument slides. They did not serve as a surrogate of underlying voluminous records. Can you tell us which exhibits you're referring to? Yes, Your Honor. These are, most problematically, are 905, 906, 907, and 908. They are also exhibits 900, 916 through 918, and 920. But I'll start with 905. Do you agree that all of these could have, I mean, these could all have been demonstratives? I think— Like the jury could see them anyway. Assume they are the government's cherry-picked closing argument slides, like the jury could see them anyway, right? I think the jury could have seen them as, in closing argument, whether or not they could have been used during trial of 611, we don't believe so. First, because we don't think they were illustrative of the fact witness's testimony. Detective Meskin didn't have knowledge and wasn't testifying of his own knowledge about facts such that these would be 611 illustrations of his testimony. But don't we have, I mean, we have precedent saying that if it could be a 611, then it's harmless. We have precedent saying that if it can be 611 and there is a limiting instruction. No, we didn't say there was a limiting instruction in that case. So, this court in Simmons has said that to do away with the prejudice— Well, right, but in the case where we said it's harmless error, we didn't talk about a limiting instruction at all. And if there had to be a limiting instruction, that would seem to say it could never be harmless, right? Because obviously if the court admits it as substantive evidence, it's not giving a limiting instruction, right? So, I'd agree. I don't know that it has to be binary, though. I mean, I think the limiting instruction—the court says you need a limiting instruction because there is a prejudice. Because what we want is the jury to focus on the evidence and not the exhibit as evidence. And what happened here is not only were they told this exhibit is the evidence, but it was an exhibit per each count in the indictment. And it didn't summarize the records— Well, the rules contemplate summaries in complex cases. They do. And it doesn't have to be a complex case. Rules of evidence. That's right. Rule 1006 would allow a summary of voluminous records. Voluminous records, yes. That's right, Your Honor. And Rule 611 would allow an illustrative aid to help show the inferences of a witness's testimony. But what cannot happen is the government can't create a document that says for count 2, look at these 30 exhibits, these 30 exhibits, what this witness said, that this witness said— Didn't they have to take that part off? I mean, didn't they have to take off the count part? They did. That's right. After it had been admitted, and after it had been published, and after it had been testified to, the court— And we have that—is it Oloyede? I'm not sure how you pronounce it, right? Yeah. Where this is what happened, right? They said there was—the court found there was an error in admitting it as substantive evidence, but then said it was harmless because it could have been a demonstrative. I think because in that case it could have been a demonstrative does not mean that it is always harmless. I think the court has to look at how it was used in the trial, the extent of what was done, and whether or not a limiting instruction was given. Because other courts have said the way to cure the prejudice is with a limiting instruction. So what is the error? I guess we have to—we're skipping over the first step here. Sure. A summary has to be an objective summary of the records. And the error here is that the exhibits were not that. They were selections of some exhibits. They were selections of testimony. They were selections of everything, and they were submitted not as an objective summary of records, but as a highly curated, cherry-picked version of the records. So the government says we took certain exhibits and we compiled those exhibits into this summary. So do you disagree with that? I don't disagree that it's based off other exhibits. But if you look at 905—  It's not an accurate summary. —summary of those other exhibits? It's not a complete, and it's not accurate. It has only pulled out the very few pieces of data from those exhibits that they think show Mahan is guilty. But a summary is like not telling you everything, right? Otherwise, it wouldn't be summarizing. Are you saying—I found the briefs hard to decipher on this point. Are you saying there are some entries that are left out, like they only included, you know, three of the four sales that are reflected in this exhibit? Or are you saying, well, for every sale, they included three data points, but not all 12 data points that are in the underlying exhibit? I'm saying both. And if you look at the invoices, and they only selected out certain electronics, and they only selected from thousands and thousands of electronics that this company sold, the very few specific ones that related to their narrative of guilt. So I had a question about Exhibit 102, which is supposedly one of the exhibits that underlies 900. Yes. We don't have 102 in the Record on Appeal, and it's not available on the docket. So I could not figure out who is right on this point. The government says we included every IMEI that's in 102 is in 900. And then you have this hypothetical chart in your reply saying, here's things that are from 102 that, are you saying they're not in 900? Or are you saying they're mentioned differently? They're not in 900. So what they did in 900 is they went through the invoices, and they didn't pull out all the electronics. They pulled out the cell phones with the IMEIs that were related to this case. And so what I've attempted to do in alternate 900 is go to those exact same, go to the sales invoices, or the purchase invoices, and pull out all of the electronics that are not these cell phones, that weren't bought over the counter, that didn't come from other wholesalers, that are simply omitted from it. So the government, I guess they say, we pulled out everything that was a foreign sale, was sold overseas, and that's the limiting part of 102 that you disagree with. You would take everything from 102. I think you have to make a summary that objectively summarizes all of the records, not just the pieces of the record that support your theory of liability against Mr. Mahana. So it wasn't an objective summary. That's correct. It was a highly selective summary. And that is summarizing other witnesses' trial testimony is even more problematic, because that's not a voluminous record that needs to be summarized. These very clearly were the closing argument slides, because in closing argument, they showed right up again. So they really had two bites at the apple. They got to do their closing argument with a witness on the stand, then they had their slides admitted as substantive evidence, and then they turned around and were able to say, this is the admitted evidence. You may take this piece of paper as fact, that these are the things that relate to this specific count, and as to 906, these relate to count three. And one of the most problematic parts is that they selected this fraud determination, which was something that AT&T... Sorry, can I follow up on one thing? You said there's testimony that's summarized in these summary exhibits. What is that? I didn't see examples of that in your brief. You just say it. Sure. At the bottom of it, you'll see the highlighting. And it connects, by highlighting, they connect certain IMEIs or phones to certain trial witnesses who testified that their credit had been compromised. Yeah, these are the ones that are related to particular witnesses. And you can't get there without summarizing the testimony of the witness that I had this happen to me. Only through the witness do we know that this is Ronald Ruggles' phone, for example. So you couldn't have had the highlighting, and you couldn't have connected anything in that exhibit to the witness without the witness having testified. So it's just the highlighting. And then the statement of who it was. Like at the bottom of the exhibits, it said the witness's name. So as to those, the third column said fraud determination. And this was that Verizon had determined that it was first payment fraud or account takeover fraud. And we objected to those being mentioned at all because those were decisions about fraud Didn't the district court give some limiting instructions? He did. Kind of repeatedly about that? He did. But that's the problem, is that in this exhibit that then gets admitted, one of their four columns is fraud determination. And they put it back in front of the jury over and over and over, despite that limiting instruction, and say in their brief to this court, well we picked that because it's one of the most relevant factors. But the court said it's irrelevant. And jury, you're not to consider it. And so to repeatedly put that through its exhibit, and then have that exhibit admitted as substantive evidence, we think is prejudicial. And we do believe that maybe there could have been, in an instance, something could have come in that was a summary exhibit. But we don't think it could have come in through Meskin's testimony. And we think in this case, a limiting instruction was necessary so that they weren't confused and they weren't focusing on what was published and what was submitted. The next issue that we saw as most problematic were these business records of Verizon, AT&T, and T-Mobile Sprint. And in short, what happened here is the government did an investigation. It created a list of cell phones that Mr. Mahana had sold, and a list of cell phones that Mr. Mahana had purchased. And it gathered data about those two different, the sales and the purchases. It then sent that list, that spreadsheet, to the cell phone carriers and said, give us information about those phones. Now, had they just given information that was their business records, their data and spreadsheet form, I don't know we'd have an objection. But what they did is they incorporated the government's investigative work product into their spreadsheets. They then sent those spreadsheets. Who's the they in there? Verizon, AT&T, and T-Mobile Sprint. And they showed up with... How did they incorporate it? Is it just that the government asked us about these specific sales and those are the ones that we pulled our data on? No. What other part of the investigation? As to Verizon, the exhibit was never a paper copy. It was an Excel spreadsheet. And it's in the special media volume. If you look at exhibit 14A, it has multiple sheets. And when you look at the sheets that are in Excel, you see that it is the replication of the government's investigative data. And the AT&T spreadsheets, 27A and B, there's data in those spreadsheets from AT&T about the date Mahana purchased the phones, about the wholesaler that he purchased it from, about the date he sold it, to whom he sold it overseas. And so the government's investigative spreadsheet goes to the carriers and then comes back. And now the carriers are saying, this is our business record. But it contains all of the data that they got from the government. Had it just been their records, Judge Rushing, that would be one thing. But they have taken the government's investigative product and sent it back to the government. And now the government tried to admit it as a business record of the company. And that's the problem, is that lurking in all of this was the government's data. I asked the Verizon witness, is column BS, is column BT, is this your data? So it's just those two columns are what you're talking about? Because weren't those, the district court said you have to cover those up, take those out? So those are illustrative of the problem, and it's not just those two. But that's exactly right. He said that's not our data. But that proves the point that this spreadsheet that they sought to admit was not the product of regularly conducted business activity. And so that exhibit was inadmissible on that basis. But the data in it was. Some of it was. But what was the exhibit was a hybrid of their data and government investigative data. And because of that hybrid, it was impermissible. Can you show us what it is? I know you referenced some things that were on the spreadsheet that I didn't see. So can you show me where exactly, which spreadsheet I'm referring to? Yes, Your Honor. I see my time has expired. You answer questions as long as you get them. Yes, Your Honor. So in 14A, I believe that there are three sheets. And I don't have it right in front of me. But in the Excel document, it should be sheet one and sheet two and sheet three down at the bottom. And in our opening brief, we walk through with specificity how to find those. And one of the sheets is called, I believe, Mahana Sold. And one of the sheets is called Mahana Purchased. And I believe that's in 14A. Or more importantly, 14A also has the far right columns BS and BT. And they were actually highlighted in yellow. And they show the incorporation of the government's data. Additionally, Your Honor, in Exhibits 27A and 27B, they have specific data about the dates Mahana sold or Mahana purchased specific devices. And there's just no way that AT&T or Verizon had in their business records data from this other company. Yeah, because like, for example, in 27A, you say that row two indicates that on January 8th of 2018, that WCF sold an iPhone with the number. But I can't seem, and maybe it's me, I just can't seem to find it on row two. And so, and I don't even see the date that you put in there in your, as an example. And not having the special volume in front of me. That's fine, yeah. So, we feel confident that data was in there because they are, they were Excel spreadsheets and not paper documents. They existed only in digital form. And they're multi-layers, they're multi-layers of sheets. And so when you look through 27A and B, you see the additional data. And when you look, 27C, for example, is perhaps another one. You have to marry both 27C with the testimony from Mr. Daigle from AT&T. He said that when he was given the list of IMEIs to look at, he then went and did his own research. He went and checked the blacklist. He went and checked Verizon and other companies' records. And he then inputted that data into his system so that his... I thought he said that was in their system. It became in their system when he... He did his own research using the company's business records. It was pulled through our billers, through our database. Researched information in our supply chain. He also went and checked GSMA's blacklist. And I believe it's JA 776 and 777, where he said he went outside their sources to gather information so that it would be complete. And so that, to us, was really a business. It got the subpoenas. It went and did investigative work. So the data that it then received wasn't prepared in the ordinary course of business. And then it turned around and tried to pass that stuff off as its own data. I see my time has expired. I haven't reached what I think might be the most interesting, which is the adoptive business records and the use of unread emails as a statement of the defendant. I'm happy to save that for rebuttal or mention it briefly with the Court's permission. I'll give you a couple minutes. Thank you, Your Honor. So the adoptive business records is a theory that the Court used to admit a number of exhibits in this case. These were clearly records that had not been prepared by Mr. Mahana. They had not been prepared by any of his companies. There were statements in there that had been made by third parties who were not testifying at the trial. And a number of them were emails sent from one business to Mahana's business. And there was no evidence that Mahana had seen those emails. Well, now, under . . . I think you . . . because one of the arguments you've made is Exhibits 201 through 219. He certified those. Yes, Your Honor. Those are . . . on the spectrum, those are the least objectionable. All right. So then that leaves you with 220 through 55. That's right. Those are the ones that were found for which there was no custodian and no certificate. But I'm talking now about the 300 series. These were the emails from Blowfish and Swift Unlock, and they were advertising emails. They were advertising the services that that company could do. And repeatedly, the objection was made, Your Honor, these are hearsay, and there is no exception for hearsay. And the court said these are business records. They're business records. They went to his company. That's . . . records are hearsay. That's in the rules. Well, and so then the question is, when you look at the foundation, the elements to have things admitted as a business record, somebody has to come in and lay that foundation. Well, if they're business records, they're a hearsay. I mean, that's what the . . . They are. But they're admissible hearsay. Yeah, they're an exception to hearsay. They're admissible. But there has to be a foundation laid. And here, there was no foundation laid. Well, and if I were to agree with you regarding that, doesn't the government already get the whole . . . all the evidence in regarding the unlocking of the . . . because he gets these e-mails. He never opens the e-mails. But there is a relationship between Blowfish because there's the WhatsApp messages between Mahana and the Blowfish employees. You also have the sums of money between Blowfish and Mahana. And so how is . . . even if that is an error, how is that not harmless because it's already in the record that there was some relationship between Blowfish and Mahana regarding unlocking the cell phones? The government was using these e-mails, these particular e-mails, to say unlocking is itself wrong. It is nefarious. It's a violation of the law. And so by receiving these e-mails that say, hey, we can unlock a stolen phone, that meant that Mahana was therefore knowingly engaging in the conduct of illegally unlocking phones. What's problematic . . . Wasn't there plenty for the jury to infer that from, even without the e-mails? I mean, they heard that the carriers will unlock them for free, or you can pay over $100 to have this private service unlock them. Doesn't that let the jury infer that maybe you're up to something if you're paying lots of money for something that would be free if you were doing it legitimately? What the jury heard was a number of different pieces about unlocking. The government started this case by saying it is a crime, it is wire fraud, to unlock these phones. And we moved to dismiss that count, and the district court granted that motion, and count six was dismissed from it. We had experts lined up to testify that locking or unlocking the phone was not a violation of law, and it was perfectly permissible. And the court, by striking that count, said we're not going to get into this. I'm not going to weigh in on whether the Digital Millennium Copyright Act or the Unlocking Act makes it problematic or not. Stay out of it. And so that's what we were told to do, and despite that, these exhibits drove right back into and repeatedly, it seemed to me, the government was going back at the idea that unlocking a phone or paying somebody to unlock a phone is itself a violation and is somehow nefarious. And so when AT&T or Verizon comes in and says, yes, we'll unlock it, but if anybody else unlocks it for a price, you should infer that they have bad intent, I think that's something that could be inferred. But what happened here is they used statements from Blowfish, which were not Mahana statements, which had never been seen, and they essentially turned it into his confession. Like, he didn't adopt these, he didn't act on them. The court even recognized there's no evidence that he ever saw these. And the carriers all said that unlocking a phone is not illegal, right? That evidence, it never came in. Well, can I give you a couple of minutes? Yes, Your Honor, and I appreciate the question. So I think this is really important, because what it does is... I know what you think is really important, but I said I'd give you a couple of minutes, and you had about ten. I do appreciate the courtesy. I will sit down and hear from Ms. Ray. Think about what you're going to say over the rebuttal. Yes, Your Honor. Ms. Ray? Good to see you, Ms. Ray. Thank you, Judge King. May it please the Court, Amy Ray for the United States. Your Honors, Judge Cogburn did exactly what we want district judges to do when faced with questions of evidence. Judge Cogburn listened carefully to lots and lots of argument. He considered authority that the parties presented. He is well familiar, as Your Honor noted. He decades spent as both a trial lawyer and a trial judge. He knows these rules, and he made reasonable, fair decisions. The question on appeal is whether any of those decisions were so arbitrary or capricious that they affected Mr. Mahana's right to a fair trial. Was it appropriate? Were they somehow injurious and caused the result to be what it is? Absolutely not. This case was about the witnesses who testified, not the charts that generated so much of the ink in the transcript primarily because the parties were disagreeing about whether they should be admitted, but they weren't ultimately that important to the government's case. But even if they had been, the judge made very reasonable decisions, and it certainly wasn't arbitrary or capricious. In terms of the summary charts, I will note that I'll just exhibit 900. What exhibit 900 does is it takes the government made the choice to focus on the purchase orders and phones that were shipped overseas because those were most likely to be involved in criminal activity. 1006 does not require that the summary be something other than a summary, and in exhibit 900, it was very helpful because the jury got to see which exhibit. They could cross-check. The interesting thing about this case, which is different than most cases involving 1006 charts, is every single one of the underlying documents was admitted. So I don't understand how it could be prejudicial, especially when 900 says, hey, if you want to see where this IMEI phone was sold or purchased by the defendant, check out exhibit 101, 102, etc., etc. So perfectly appropriate. My friend, Mr. Jones, talks about exhibits 905 to 908, and he talks about how it connected with witness testimony through highlights, but those highlights were taken off by the district court. The district court required that the government remove the highlights and remove the count one, count two, really count two through count five, I think. They had to take that out. Now, yes, it had already been shown to the jury, as it could have been in closing argument, drawing the connection between this chart and this particular count, but the judge made the right decision, ultimately, to sanitize that exhibit for purposes of the trial itself and allow the government to make that connection. In terms of the, and I'm just going to hit these quickly unless your honors have questions, the spreadsheets by the carriers, every single one of those carriers testified, the representatives, Mr. Walker, Mr. Daigle, and Goetz, that that data was exactly the same as what was drawn from their electronic records. There are a number of decisions cited in our brief that talk about how, especially in the day of electronic records, the record is not some piece of paper, right? We can now, I bought a cell phone two weeks ago. I never touched a piece of paper. You can sell a house without touching a piece of paper. The data isn't even on a particular computer. It's sitting in some server that could be across the ocean. So what the data is is not a piece of paper. It's the record itself. It's the number. It's the date. And so it doesn't matter if you present those in court in a slightly different format. It doesn't even matter, I think, in this case, that the charts included the IMEI numbers that the government had presented because those were the numbers that the, one couldn't expect Verizon to show up with every single IMEI that had ever been involved, sold by Verizon. The defendant claims that there's other information in these spreadsheets like the dates that he bought and sold them and things that weren't actually the carrier's business records. What's your response to that? The only ones that I'm aware of, and I will say that I truly couldn't find what Mr. Jones references. So BT and BS on the Verizon, yes, and then those were covered up. So there were two columns on Verizon that Verizon explained. The reason Mr. Walker explained that the reason those columns existed was actually just to make sure that the device hadn't been returned to Verizon. He wanted to make sure that there were no duplicates. It was actually an effort to be fair to Mr. Mahana. But these were all business records. Yes. That's what the, I don't understand what Mr. Jones said. They were not business  Well, of course they were business, yes, they were absolutely business records. And I think what Mr. Jones is contesting is that somehow they were not representative business records because they weren't inclusive of every IMEI that ever existed and instead came from the governments. And some, I think he was disputing Judge Rushing that on the top of some it said Mana purchased or Mahana sold. But the government explained all of that and the witnesses explained it, Agent Meskin, that that's because those came from that original 900, Exhibit 900 that is, because they ultimately found and chose to include the IMEIs which related to cell phones that were either bought or sold by Mana overseas. So it just, it kind of adds up to nothing in terms, in my opinion, in terms of both the effect but also just what's reasonable. I mean Judge Cogburn really I think worked hard in this case to make sure that he made reasonable decisions. And what was it, like a three week trial? Yeah, it was at least a couple of weeks, Your Honor. I actually meant to look that up before coming up here today so I could tell you exactly how many days. Mr. Jones will undoubtedly recall because he was in that courtroom. But it was a long trial and Judge Cogburn made... Was it in Iceville or Charlotte? It was in Charlotte. Yeah, it was in Charlotte. Just to quickly hit the 300 series of exhibits that Mr. Jones talks about, those unlocking emails, of course those were a minuscule part of the government's case, those particular emails. But more importantly, as Judge Benjamin, as you sort of referenced, there was a lot of evidence that wasn't related to the disputed exhibits. Perhaps the best one for the government's purposes to show that it would be harmless even if it were error was the evidence of his messages, WhatsApp messages with his brother in UAE. I will reference, for example, joint appendix pages 1085 to 86. He screenshots an unlocked Blowfish Unlocks advertisement that says they can unlock fraudulent phones. So in all the evidence about how at one point there was Mr. Mahana had $11,000 deposited with Blowfish Unlocks. Now, of course, he could have had legitimate reasons for doing that, but there was lots and lots of evidence that he didn't. And also there was so much evidence about the unlocking feature because it was at least a fair inference that if you're going to pay and have on deck $11,000, there's a reason you're hiring Blowfish Unlocks instead of going to AT&T, Verizon, or Sprint. If Your Honors don't have any other questions on the evidence, the only thing I do want to make sure I hit is the forfeiture issue. The cross appeal. The cross appeal. The rare time when I get to stand up here as an appellant because the district judge just got this wrong. Judge Cogburn, I think, felt . . . He is a judge who feels for defendants. I think all judges do. And he was concerned about double recovery, which is not something that . . . No one warned him about this, right? No. Right. It seemed like the defendant thought of this argument in the moment and brought it up, and the government wasn't prepared to say, look, here's a statute in a Fourth Circuit case that says you can't do that. Absolutely, Judge Rushing. But Judge Cogburn thought he had discretion. He did. And you're saying he doesn't. He does not. He does not. And I think we . . . But nobody told him. Nobody told . . . Well, I mean, we did say at sentencing hearing that we didn't think it was excessive fines, et cetera, but it was . . . I don't know, Judge Rushing, whether Mr. Jones thought of it then or whether he thought of it ahead of time, but there was no objection ahead of time. Right. And there was . . . And even Mr. Savage, one of our most experienced prosecutors, said, I feel a little sandbagged because he just wasn't expecting that discussion. And it was erroneous, and so the judgment as to the forfeiture needs to go back for the entry of the judgment in a judgment that incorporates the preliminary . . . Do we have to specify that part, the specific amount, or can we just remand for entry of forfeiture and leave it to Judge Cogburn to sort out the details? Probably, although I think actually the Rule 32.2 would require the entry of the preliminary order that he's already entered because the jury made the special verdict finding and all the rest of it. So I think what would be appropriate would be a remand that says to impose to enter the forfeiture judgment consistent with the preliminary order of forfeiture. That's how I read 32.2. But if Your Honors read it differently and think it just needs to go back for him to make the determination, that's fine. I think the most important part is it's mandatory. And also, because Mr. Mahana has raised the excessive fines issue to make it very clear that it's not excessive, which would be most inconsistent with this Court's precedence, I can give Your Honors the cases here that . . . But it's not excessive. It doesn't violate any statutory maximum. And . . . It could be challenged under the Constitution. It could be. I mean, he does. Right. That's why he could have an Eighth Amendment claim. Absolutely. But that would require a grossly disproportionate forfeiture when compared to the gravity of his offense. And what this Court has done consistently is say, look, if you're involved in an offense where the proceeds were $1.2 million, forfeiture in that amount is perfectly appropriate. Even if . . . And in one case . . . I'm blanking on the name of the case. Actually, it was Boland. In that case, the defendant only got $30,000. And this Court upheld a $1.2 million forfeiture judgment because the conspiracy. Your Honors, if you don't have any further questions, we would respectfully request that this Court affirm Mr. Mahana's convictions and sentence, but vacate the judgment for the entry of a forfeiture judgment consistent with the preliminary order. Thank you, Your Honors. Thank you very much, Ms. Ray. Good to have you with us. Thank you. Always great to be here. Mr. Jones? Thank you, Your Honor. So the problem with the summary exhibits is that because they were selective of other exhibits that had already been admitted, by that selection process, they impermissibly bolstered and gave extra weight to certain parts of the data that only reflected the government's theory of the case, and by that selection and by that admission as subjunctive evidence against Mahana, were improper and prejudicially bolstering. If the Court goes back and looks at the special or the media exhibit, it will find in Exhibit 14A multiple sheets. And I'm happy to submit a supplemental 14A, 27AB if they didn't come through in that, but there are multiple sheets in that exhibit which fairly clearly demonstrate that what was sent in to the jury was not just Verizon's data. It was the government's data and Verizon's data. And it can't be any more clear than when I asked Mr. Walker from Verizon, and this is a joint appendix 501 to 504, I showed him the spreadsheets. I said, is this your data? And he said, this is not our data. That is an admission that the thing the government wanted to admit as evidence was a hybrid of Verizon data and the government's investigative data. I agree that the spreadsheet didn't contain everything in the world about every cell phone, nor did it contain every conceivable entry. And I don't have a problem that spreadsheets are an appropriate way to display voluminous data from Verizon. And I agree that not everything is written in paper. But what cannot happen is the government can't send its investigative work product to a carrier or to any business and say, look into this for us. And then that business to send back a hybrid of data that is its own and that is that government work product. And that's what happened here. As to the summary exhibits, 905, 906, 907, please take a look at those again. The government says now the judge did the right thing. And there's no prejudice here because those were taken off. But one, too late. And also, why? Why were they taken off? Why did Judge Cogburn think that there was something wrong about it saying count two, count three, count four? Because he understood that it meant that they were pulling out for this one substantive exhibit, not a demonstrative, but substantive, the different pieces of trial evidence, not voluminous other records. They were pulling out pieces of trial evidence to highlight for the jury just what they thought was relevant for that specific count as to each of those. And he asked that those be stricken because he understood that that was a  As to the length of trial, it was a five-day trial. And it would have been four days, except the government asked that we do it on the fifth day so that it could do its cross-examination of Mr. Mahana at the beginning of the week. So it was not a two-week, it wasn't a three-week trial. Yes, there was a lot of ink about these exhibits, but many of these exhibits should not come in. Or had they been presented under proper evidence with the correct custodian, the correct witness, there would not have been an objection. Many of the pieces of evidence that came in were unobjected to because they didn't offend the rules of evidence. But a great many of them did. And so individually and cumulatively, we believe that Mahana was prejudiced. Do you want to say anything about the forfeiture? Very briefly. The Supreme Court has said the Eighth Amendment is a backstop. And so while I understand there's case law from the circuit that says it's mandatory, the court can't just always do it. When an Eighth Amendment claim is raised... Well, it's mandatory, but if there's discretion about the amount, that seems to be where an Eighth Amendment argument could be made, is, well, the amount is excessive somehow. But I didn't see that anywhere in the papers, any fleshed-out argument about why this amount is unconstitutional. So we raised, we said... And there wasn't a judgment, right? So there's not even really a forfeiture amount to be arguing about at this point. That's correct. That's part of the reason why if the court vacates and is then back, it can't specify why. Because the court has to do an analysis of what it thinks is... if it thinks anything is excessive. And if the court has the authority to say that it's excessive, it could look at it and say, I think, one, potentially. Now, it might not withstand scrutiny, but it has the right to do that analysis in the first instance and to analyze the Bajor-Keyesian factors and determine, given everything else that's happened in the case, whether or not the entry of a forfeiture is appropriate. And then there are different kinds of forfeiture. And so in this case, there were specific jury findings about specific pieces of property. But then there was also the request for, on top of that specific forfeiture, a money judgment in the amount of $3.6 million. And so the court could determine, under an Eighth Amendment analysis, that only forfeiture of that property as found by the jury is appropriate, but that an additional $3.6 million is inappropriate. The judge, in the first instance, has to make that. But the judge does get to weigh the factors. And I think it is an open question whether or not, as part of the Bajor-Keyesian factors, the court can consider what other payments the defendant is making. Other circuits have said we look at whether or not this fine would permanently deprive a defendant of his future livelihood. We look at it in connection to the loss. And so I think this court could, in its analysis, if it were remanded for that purpose, say, I believe that something less than a $3.6 million money judgment, when I've already saddled him with a $3.6 million restitution judgment, and I've imposed a fine, and I've imposed a special assessment, it gets to alter that number. We do believe that the case should be vacated. I would ask the court to look back at the opening reply briefs, and particularly to look at the spreadsheets and the exhibits. We believe that there is prejudice to Mahana, the trial. As much respect as I have for Judge Cogburn, I do believe that the errors affected this trial, and the case should be vacated and remanded for a new trial. Mr. Jones, we really appreciate your work. And my papers indicate that you're a court-appointed? Partially. You mean you were retained for the trial and appointed for the appeal? I was. For what? I am appointed in the cross-appeal. You're appointed in the cross-appeal? Yes. You're partially appointed? Correct. Well, good thing it gave you a couple minutes to argue about, sir. Thank you, Your Honor. You earned your pay. Thank you. But we appreciate your work. Yes, Your Honor. And you've made a commendable effort. Thank you, sir. On behalf of your client. We'll come down and greet counsel, adjourn court for the day. I wish everybody the best.
judges: Robert B. King, Allison J. Rushing, DeAndrea Gist Benjamin